## MOONEY v. THE STATE.

1. The words inveigle, entice, steal and carry away, in the Penal Code, (Clay's Dig. 419, § 18,) denote offences of precisely the same grade, and may be included in the same count of the indictment; and upon proving either, the State is entitled to a conviction.

2. The offence of inveigling, or enticing away a slave, is consummated, when the slave, by promises, or persuasion, is induced to quit his master's service, with the intent to escape from bondage as a slave, whether the person so operating on the mind and will of the slave, is, or is not present when the determination to escape is manifested, by the act of leaving the master's service, or whether he is, or is not sufficiently near to aid in the escape if necessary.

Error to the Circuit Court of Montgomery.

THE indictment charged, that the prisoner, and two others, "did unlawfully, and feloniously, inveigle, steal, carry and entice

away, two negro slaves, the property of Francis M. Barnett, with a view, then and there, feloniously and unlawfully, to convert the said slaves to the use of them, the said Henderson Brewer, James McKowen, and John, alias Jack Mooney." The prisoner demurred to the indictment, and his demurrer being overruled, pleaded not guilty.

Upon the trial, as appears from a bill of exceptions, the State offered evidence, tending to prove, that the defendants with others, had entered into a combination to steal negroes in the neighborhood, and that on the night of the 29th March, 1844, the prisoner admitted that he was furnished with a horse, and ten dollars, and told by Brewer, to go to the residence of Barnett, and see the said slaves, at a place designated, near Barnett's House, and inform the negroes, that they, Brewer, and McKowen, would be at that place on the next night, and be then and there ready to take them off. That he communicated the message to the slaves, finding them at the place, and left them, telling Brewer what he had done. That Barnett, being advised of the effort to steal his slaves, with some of his neighbors repaired to the place appointed, on the night of the 30th March, 1844. That the slaves were at the place agreed on, between them and Mooney; that Brewer and McKowen, came riding up, on horseback, to the place where the slaves were, and after inducing them to go with them a few steps, were hailed, and fired upon by the party who were watching, upon which they abandoned the possession of the slaves, and galloped off. On the next morning, the prisoner, Brewer, and McKowen, were seen about ten miles from the place, the former aiding the latter in getting a horse, to make their escape.

Upon this state of facts, the Court charged the jury, that if they found that the prisoner was, on the night of the 29th March, 1844, to meet the slaves named in the indictment, at the place where they were subsequently seen by him; and that he had in accordance with, and in furtherance of, a common design to obtain and carry off the slaves, visited them, and delivered the message, and that this was done with the view of inveigling, or enticing, or aiding, in the inveigling and enticing said slaves to leave their master's service, and go away, and further found, as aforesaid, that this was done with a view to convert said slaves to the use of said Brewer, McKowen, and Mooney, or any of them;

42

and should further find, that in pursuance of such advice, and persuasion, the said slaves were on the next night induced to start, for the purposes aforesaid, and did, for any period of time, no matter how short, leave their master's service, for the purpose aforesaid, then they should find the prisoner guilty, under the indictment; and, whether he was actually or constructively present, on the night when the negroes were taken, would make no difference.

The prisoner asked the Court to charge, that unless the State proved all the allegations of the indictment, they must find for the prisoner; which the Court refused, and charged that if the prisoner was guilty of inveigling the slaves, from the possession of their master, with a felonious intent, it would be sufficient.

To the charge given, and to that refused, the prisoner excepted, and a writ of error being allowed, he now assigns for error—
1. The judgment on the demurrer; and, 2. The charge given and refused.

BELSER, for plaintiff in error, The 18th section of the 4th chapter of the Penal Code, on which this indictment is founded, must be construed in connection with the two preceding sections, and, so considered, is defective in not alledging that the slaves were taken from the possession of the master, or owner. [4 Porter, 410; 1 Gallison, 497; 2 Hawkins, 249.]

The indictment is double, charging distinct offences. [2 Mass. 163; 2 Lord Raymond, 1572; 9 Wendell, 203; Archbold's Crim. Pl. 25.]

The Court erred in its charge, as the prisoner was not actually, or constructively present, when the slaves were taken, and was therefore not guilty of either stealing or inveigling the slaves. [1 Russell and Ryan C. C. 25, 99, 113, 142, 249, 332, 421.]

The charge in the indictment must be proved as laid. [3 Day, 283; 2 Nott & McCord, 3; 2 Dev. & Batt. 390.]

ATTORNEY GENERAL, contra. The statute does not require the slave to be stolen out of the possession of the master, as was the fact in Brown's case, cited from 4 Porter, 410.

The indictment does not charge distinct offences, and if it did, as they are divisible, and of the same grade, it would be no valid

objection. [4 B. & C. 330 ; 2 Camp. 583 ; 2 Lord Ray. 860 ; Ros. C. Ev. 90.]

To constitute the offence of inveigling, or enticing away a slave, it is not necessary that the slave should come to the actual possession of the offender ; it is sufficient, if the slave is induced by such persuasion, to leave his master's service.

ORMOND, J.—The objection urged against the indictment, is, that it charges several distinct, substantive offences. The language of the act is, "Every person who shall inveigle, steal, carry or entice away, any such slave, with a view to convert such slave to his own use, or the use of any other person, or to enable such slave to reach some other State, or country, where such slave may enjoy freedom, such person shall, on conviction, be punished by confinement in the Penitentiary, not less than ten years." [Clay's Dig. 419, § 18.] There does not appear to be any tangible, or substantial distinction, between the terms " inveigle" or "entice," as employed in this act. Both signify to allure, to incite, to instigate, to seduce, to the doing some improper act. It is true, " entice" may be used in a good sense, but that is not its natural meaning, and when so used, it is figurative, and shown to be so by the context ; here it is evidently used in its natural, proper sense. The word " *steal*," being technical, ordinarily imports a larceny ; but here it is evidently employed, as a synonime of "*carry away;*" for the act declares that the offence shall be complete, though there is no intention to convert the slave to the use of the taker, or of any other person, which is an essential ingredient in larceny. These are, then, all offences of precisely the same grade, although there may be a slight distinction between the two classes of " stealing and carrying away," and " inveigling and enticing." Whether, then, they are considered as distinct offences, or not, as the same penalty is provided for each, they may be included in the same count of the indictment.

Thus, in The State v. Murphy, 6 Ala. Rep 846, it was held, that one might be charged in the same count, with " receiving and concealing" stolen goods, though the language of the statute was in the disjunctive, " buy, receive, conceal, or aid in the concealment of stolen goods."

In The Commonwealth v. Eaton, 15 Pick. 173, an indictment,

upon a statute forbidding any person from selling, or offering to sell a lottery ticket, which charged, an *offering and selling*, was held to be good. In Rex v. Hunt, 2 Camp. 583, upon an information for a libel, charging the defendant with *composing*, printing and publishing a libel, it was held to be sufficient, to prove the publishing and printing. Lord Ellenborough said, " The distinction runs through the whole criminal law, and it is invariably enough to prove, so much of the indictment as shows that the defendant has committed a substantive crime therein specified."

In indictments for forgery, the established form is, to alledge that the prisoner " feloniously, did falsely make, forge and counterfeit, and feloniously did cause, and procure, to be falsely made, forged and counterfeited, and feloniously did willingly act, and assist, in the false making, forging, and counterfeiting, a certain bond," &c. [3 Chitty's Crim. Law, 1066.] Here, as in this case, distinct and substantive offences are not charged, but different grades of the same offence, punished by the same penalty, and upon proving either, the State is entitled to a conviction.

The question made upon the charges given, and refused, are, whether, to constitute the offence of inveigling, or enticing away a slave, it is necessary that the slave should come to the possession, or be under the actual control of the accused.

To a correct understanding of this statute, it is necessary to look at the condition of our statute law, as to this offence, previous to the adoption of the Penal Code. The statute then in existence, made the offence of stealing a slave, simple larceny, punishable capitally—and in Hawkins' case, 8 Porter, 461, it was held, that the offence was not complete, as the slave was not to be converted to the use of the taker, but to be conveyed to a free State, and enjoy freedom, and therefore the act was not done *lucri causa*.

So in Wisdomes' case, 511 of the same book, it was held, that the offence was not consummated, until the prisoner was sufficiently near the slave to aid him, if pursuit was attempted, or so near as to be capable of taking actual control over him. Such being the state of the law, at the time of the passage of this act, no other construction can be put upon it, than, that it was intended to make a radical change in the law in this particular, and to make the offence consist, not in the actual manucaption, but in the seduction of the slave from his master's allegiance, and thus

to strike at the root of the evil. If an actual *asportavit* was necessary to the commission of the offence, it could scarcely ever be established, as the slave, an intelligent being, could by his co-operation, produce the same result as an actual taking, in the case of the theft of any other chattel.

It is, we think, therefore, perfectly clear, both from the phraseology of the statute, and the mischief intended to be prevented, that it was the intention of the Legislature, to create an offence essentially distinct from larceny at common law: It is not the fraudulent taking the goods of another, with intent to convert them to the use of the thief, which is denounced by the statute, but it is the influence exerted over the mind of the slave, as an intelligent being, to quit his master's service. This is consummated, when the slave, by promises or persuasions, is induced to abandon his master's service, with the intent to escape from bondage as a slave; whether the prisoner so having operated on the mind, and will of the slave, is, or is not present, when the determination to escape is manifested, by the act of leaving the master's service, or whether he is, or is not, sufficiently near to aid in the escape, if necessary. This is to "inveigle or entice away," under the statute, according to its strict letter, as well as its obvious intent and meaning; and the construction of the statute, by the Court, in its charge to the jury, being strictly correct, its judgment is affirmed.