## SPIVEY *vs.* THE STATE.

1. The statute of this State respecting the stealing inveigling &c., of slaves (Code, § 3130) was intended to afford ampler protection and security to slave property than was afforded by the rules of the common law, and makes several radical changes in the common law.

2. When one man has carried away the slave of another, the question whether or not he is guilty of a felony (under section 3130 of the Code) depends on the intent with which the act was done ; whenever there is not clear and satisfactory proof of the felonious intent denounced by the statute, concurring with the act of carrying away, there is no ground for a conviction.

3. At common law, a taking was necessary to constitute larceny ; but not so, as to all the offences created by this statute.

4. At common law, a bailee, who had acquired possession of goods without any intent at the time to steal them, could not, during the continuance of the bailment, commit larceny as to such goods, unless he broke the bulk or package; but this statute makes no such exception: it includes "any person" who commits either one of the acts denounced by it with the felonious intent indicated by its terms ; it embraces the carrying away, &c., of "any slave," whether in the actual possession of the owner, or of a bailee, or in the merely constructive possession of the owner.

5. Conversion, and carrying away, are neither synonyms, nor convertible terms: a felonious carrying away of a slave, necessarily includes a conversion, but a conversion does not necessarily include a carrying away ; and a mere conversion, even with a criminal intent, is no felony, unless there is also a carrying away.

6. A charge is erroneous, which instructs the jury "that, if they found there was a conflict between the special charges given by the court, at the defendant's request, and the main charge, then the latter must prevail."

7. The defendant's declarations, made while he was in possession of the slave, "as to the manner in which he bought him," are not admissible evidence for him under an indictment for stealing the slave (Code, § 3130).

8. But any evidence tending to prove that the defendant honestly believed that he had the right to carry away and sell the slave, is admissible for him ; and therefore, where defendant had possession of the slave under a bailment from the former owner, (since deceased,) the declarations of the bailor, tending to show a sale to defendant, are competent evidence, although referring to a paper which is not produced and whose absence is not accounted for.

APPEAL from the City Court of Mobile.

Tried before the Hon. ALEX. McKINSTRY.

THE indictment in this case was found at the June term, 1854, and charged, "that William H . Spivey inveigled, stole, carried or enticed away a slave named Joe, the property of Jo-

seph H. Skinner and George W. Skinner, with the intent to convert said slave to his own use." The defendant pleaded not guilty, was tried, convicted, and sentenced to the penitentiary for five years. During the progress of the trial he excepted to several rulings of the court, which are set out in the following bill of exceptions:

"On the trial of this cause the State introduced one Joseph W. Skinner as a witness, who testified, that he was the son of Henry A. Skinner, deceased, who died on the 4th day of October, 1853, in Mobile; that defendant had possession of the boy Joe, in the year 1853, for some time before the death of H. A. Skinner, but witness had no personal knowledge of the means by which defendant had acquired the possession; that said boy Joe had always been in the possession of H. A. Skinner, up to the time of his going into defendant's possession; that the mother of said boy belonged to said H. A. Skinner before the birth of Joe, and was in his possession when Joe was born; that said Joe belonged to witness and his brothers George and William Skinner; that witness was nineteen years of age, and his brother George about seventeen, and that William died several years since an infant; that the mother of Joe had been given, before Joe's birth, to witness and his said brothers by one Ann Hazzard, who had purchased her at sheriff's sale under an execution against said witness' father, H. A. Skinner; that he (witness) was absent from Mobile, at sea, from the year 1852 until after the death of his father in October, 1853; that some time in April, 1854, he saw defendant in Baldwin county, and asked him for the boy Joe; that defendant then told him that he had sold Joe in New Orleans for $600, and that he had purchased the boy from witness' father, in April, 1853, in this manner, viz., that one George Strickland, from Georgia, was in Mobile in 1853, who was indebted to him (Spivey), and witness's father was indebted to said Strickland; and that the two debts were paid by the sale of the boy Joe by witness' father to defendant. The witness further testified, that Spivey told him, in the same conversation, that witness' father, at the time of the sale, had said to him, 'I wish you would not dispose of the boy before the fall, as I wish to get him back if I can raise the money to pay for him.' These declarations of the defend-

ant were brought out by the State in its examination of the witness.

"Mrs. Skinner, the mother of the last witness, was then introduced by the State, and proved that the mother of the boy Joe had always remained in the possession of her deceased husband, H. A. Skinner ; that (*Joe ?*) had also, until about January, 1853, when he was placed by said Skinner in the possession of the defendant ; that the defendant, who at that time was living in Mobile, applied to said Skinner to let him have Joe to nurse his (defendant's) children, saying that he was too poor to hire a slave, or to buy one ; that thereupon she and her said husband permitted defendant to take the boy; that it was not stated, at the time Joe was delivered, how long defendant should retain him ; that witness was well acquainted with the business of her late husband, and that he was in the habit of communicating to her all his business transactions ; that she removed to Alabama with her said husband about twenty years since, and had continued to live in Clark county until within the last three years, and in Mobile since that time ; that her husband came through Georgia on his way out, but he had never been in Georgia since that time ; that she had never known or heard of any such man as George Strickland ; that she never knew or heard of his being indebted to George Strickland, or having any business transactions with any one of the name of Strickland, and that she knew nothing of any sale of the boy Joe by her husband.

"F. S. Blount was then introduced by the State, and testified, that several years since he, as an attorney at law, had recovered three judgments in the Circuit Court of Clark county, against Henry A. Skinner, one in favor of —— Skinner, one in favor of Charles Skinner, and the third in favor of Ann Hazzard for about $400 ; that in 1846 certain negroes belonging to said Skinner were levied upon under the executions in favor of —— Skinner and Ann Hazzard, and were sold to satisfy the same ; that at said sale he purchased for Ann Hazzard a negro woman, but he did not know whether she was the mother of Joe or not; that said Ann Hazzard was a governess in the family of said H. A. Skinner, and that the said judgment in her favor was for wages due for her services;

and that she was related to, or connected with, said Skinner's family. The State here closed its case.

"The defendant then introduced one Couch, who testified, that in 1853 he was the clerk of said H. A. Skinner, who kept a wood and lumber yard in Mobile, but he had nothing to do with said Skinner's business or estate after his death; and that he knew that Joe was delivered to defendant by said Skinner in January, 1853. The defendant then offered to prove by the witness, that a short time after said Skinner's death, he (defendant), who had been residing in Baldwin county for some months, came to Mobile, and asked witness this question, 'Who had charge of the business of Henry A. Skinner? that he wished to learn whether the family or representatives of the latter desired to reclaim Joe.' The court ruled this to be inadmissible, and excluded it from the jury; to which ruling the defendant excepted.

"The defendant then introduced one Longmaster, who testified, that in March or February, 1854, defendant came to witness' house in Mobile, and placed the boy Joe there for sale; that frequent and open efforts were made by defendant to sell the boy; that several persons called at witness' house, to examine the boy with a view to purchasing him; that the boy remained at his house for about ten days, and during that time defendant took him in public places and offered him for sale; that defendant removed the boy from witness' house, and placed him at a slave depot on Royal street, kept by one Harkey. The defendant then offered to prove by this witness declarations made by defendant of the manner in which he bought him, made at the time he brought the boy to witness' house; but the court ruled these declarations to be inadmissible, and refused to allow them to go to the jury; to which defendant excepted.

"The defendant then introduced one N. S. Morton, who testified, that in April, 1853, he was at H. A. Skinner's place of business in Mobile, and then heard Skinner say to defendant, 'Notwithstanding the acknowledgment, or arrangement, (witness not being certain which word was used,) in that paper, (referring to a paper then in the defendant's hands, which witness did not read, and the contents of which he did not know,) I wish you not to dispose of Joe before the fall, so

that I may redeem him if I can.' The court ruled this state-
ment of Skinner's to be inadmissible, unless the paper was
produced, or its absence accounted for ; to which defendant
excepted.

"There was other evidence before the jury. There was no
objection to the main charge given by the court, but the court
charged the jury, among other things, that, to make out the
offence, it was not necessary that there should have been a
felonious intent on the part of the defendant when he first
acquired possession of the boy, and that, although the defend-
ant's possession may have been lawful, yet the offence was
made out, if he subsequently fraudulently and feloniously
converted the boy to his own use ; and that, though the de-
fendant may have held the boy as bailee before he sold him,
still he would be guilty, if the jury believed from the testi-
mony that he had fraudulently and feloniously converted
the boy to his own use ; to which charges the defendant ex-
cepted.

"The defendant asked the court to charge as follows :

"1. If the jury believe from the evidence that Spivey ac-
quired possession of the boy from H. A. Skinner under a
contract of bailment, and that he converted him to his own
use while so possessed by him, they could not convict ; which
charge the court refused, and the defendant excepted.

"2. If the jury believe from the evidence that, at the time
Spivey first acquired possession of the boy, he intended to
convert him to his own use, he could not be convicted under
this indictment ; which charge the court refused, and the de-
fendant excepted.

"The defendant also asked the court to give the following
charges, viz. : If the jury believe from the evidence that
there was a sale of the boy by H. A. Skinner, to defendant,
they must acquit ; that if the jury have a reasonable doubt,
whether there was a sale or not, they must acquit ; that the
declarations of the prisoner, brought out by the State, must
be considered by the jury as evidence in the cause, and, un-
less they were shown by proof to be untrue, such declarations
must be taken by them as showing a claim of title in Spivey;
that if the jury believe from the testimony that Spivey had a
claim of title to the boy at the time he sold him, he could not

be convicted; that, to authorize a conviction, the proof must be clear and convincing, and exclude every other supposition than that of innocence; which charges the court gave. There was some discussion by the defendant's counsel, while he was asking charges, which produced some confusion, and the court then told the jury, that, if they found that there was a conflict between the special charges asked by the defendant and given, and the main charge, then the latter must prevail; to which the defendant excepted."

All the rulings of the court, above stated, to which exceptions were saved, are now assigned for error.

PERCY WALKER, for the plaintiff in error:

1. Though the statute under which the indictment was framed contemplates an offence different from larceny, yet, to apply the statute understandingly to a particular state of facts, we must resort to the rules of law applicable to larceny. The rule is familiar, that where goods have been delivered into the hands of a bailee for a special purpose, who thereby acquires a right to the possession, and who, if he converts them to his own use while in his possession as bailee, even *animo furandi*, is not guilty of a trespass, he is not guilty of larceny. 1 Hale's P. C. 504; 4 C. & P. 241; 1 Moody's C. C. 474; Russ. & Ry. 92. This rule, it is conceived, is directly applicable to the case at bar. The indictment is, in effect, a charge of larceny: it contains the essential element of a charge for that crime, viz., the fraudulent intent of conversion to the taker's use; without such an intent, the offence designated in the statute (Code, § 3130) would not be complete. The cases of Mooney v. The State, in 8 Ala., and Williams v. The State, in 15 Ala., do not militate against this construction.

The bill of exceptions shows, that Spivey's possession, in the first place, was that of a bailee. H. A. Skinner, the party holding and exercising ownership over the slave, voluntarily delivered him to the defendant. It is immaterial whether H. A. Skinner was the real owner of the slave, or not: as the father and natural guardian of his children, he had the rightful possession and control; and the defendant, in receiving the slave from him, acquired a lawful possession. The case is one of bailment. The possession was parted with by the

bailor without any fraud on the part of the defendant, and nothing was afterwards done to determine the privity of contract; the subsequent conversion was no trespass, and consequently no larceny.—2 Russ. on Crimes, pp. 34-5, 56; 2 Archb. Cr. Pl. (Waterman's ed.) 382, and note; *ib*. 387. And though the conversion did not take place until after the death of H. A. Skinner, still no crime was committed; the defendant's possession was lawful, and would have entitled him to an action for damages done to the slave.

There is nothing in the record showing any inveiglement or enticement. These terms (inveiglement and enticement) apply to acts operating on the mind of the slave. Moreover, it is submitted, the words "inveigle and entice" apply to those cases only where the slave is induced or persuaded to leave his owner's possession—that is, that the slave is in the *actual* possession of his owner when the attempt to entice or inveigle him is made; and when, as in this case, the possession was lawful in the first instance, and continued for a long time with the knowledge and consent of the owner, the subsequent fraudulent conversion by the bailee cannot be regarded as an inveiglement or enticement within the statute. These words were used by the legislators with reference to the allegiance which the slave owes to his master, and must (as before observed) be restricted in their application to cases where the slave is in the actual possession of his owner; and therefore, where A hires a slave to B, or places him in B's possession for his use, if the latter, without having any fraudulent intent at the time he receives the slave, subsequently fraudulently converts him to his own use, neither one of the offences prohibited by section 3130 is made out: it is a mere breach of trust.

To make out either one of the offences created by section 3130, there must be, not only a felonious intent, but both a taking and a carrying away. The words "steal" and "carries away," as used in the statute, are synonymous with "take" and "carry away," which were essential in a common-law indictment for larceny. The word "take" does not mean the act of asportation, but the act of laying hold upon an article, with or without removing the same.—Bouv. Law Dic. p. 549. If a man takes hold of a package with a felonious intent, but does not remove it, the offence is not complete: there must be

an actual asportation—a complete severance of the possession; and this cannot be done without a carrying away. In several cases a slight removal has been held sufficient, (as removing a package from the head to the tail of a wagon; taking sheets from a bed and carrying them to an adjoining room ; taking plate from a trunk, and placing it on the floor, with intent to carry it away, &c.,) but it has always been held that there must be an actual asportation.

2. The court erred in excluding from the jury the declarations of the defendant made to the witnesses Couch and Longmaster : they tended to show a claim of property in the slave, and, having been made before the conversion, they should have been allowed to go to the jury, leaving the *bona fides* to their consideration.—See Wisdom's case, 8 Por. 511.

3. The court erred, also, in excluding from the jury the testimony of Morton, as to the declaration of H. A. Skinner to the defendant in April, 1853 : that declaration formed a part of the *res gestæ*, and should have been received in evidence. Whether or not the paper referred to by Skinner was produced, or its absence accounted for, was immaterial : the witness was not called to prove the contents of the paper; the inquiry was as to the nature and character of the transaction between Skinner and the defendant, and what was said by both parties was clearly admissible. This statement of Skinner tended to elucidate the act of the defendant : it authorized the inference that there had been a sale of the slave, and its withdrawal from the jury necessarily worked injustice to the defendant. The admissibility of a declaration depends, not merely on its accompanying an act, but on the light which it throws on an act which is, in itself, relevant and admissible.—Wright v. Doe *ex dem.* Tatham, 34 E. C. L. R. 313; 33 *ib.* 426; Roscoe's Criminal Evidence, pp. 22 *et seq.*

4. The argument on the first point shows, that the main charges given by the court were erroneous, and that the refusals to give the first and second charges asked by defendant were erroneous. The refusal to give the latter charge was also erroneous, because such refusal was inconsistent with the charges previously given.

5. The charge which instructed the jury, " that if they found there was a conflict between the special charges asked

7

by defendant and given, and the main charge, then the latter must prevail," was erroneous : it tended to give an undue preponderating power to the main charge, and to weaken and neutralize the effect of the special charges, which the court ought not to have given at all unless they were in accordance with the law ; it also referred a question of law to the decision of the jury, viz., whether or not there was a conflict between the main charge and the special charges.—Cothran v. Moore, 1 Ala. 423; 3 *ib.* 237; 5 Porter 64; 2 Stew. & P. 193; 1 Ala. 452 ; 3 *ib.* 599 ; 8 *ib.* 607; *ib.* 737 ; 6 *ib.* 631 ; 9 Porter 403.

M. A. BALDWIN, Attorney General, *contra :*

1. To have suffered the different declarations of the prisoner made to witnesses Couch and Longmaster, would have been a violation of that rule which prevents a party from manufacturing testimony in his own case.—Oliver v. State, 17 Ala. 595.

2. The testimony in relation to the paper was properly excluded, the loss of the paper not being proved.

3. The bill of exceptions states that there was other testimony not set out. The presumption is, there was testimony upon which an affirmative charge is based. In this view, the charge of the court is correct ; for there are cases in which a party comes into the possession of property, and a subsequent conversion is felony ; for instance, carriers and bailees, who terminate the contract by some tortious act.—Roscoe 597-8, and note (3); 1 Hale 505; 2 East 659, 682.

4. Suppose the owner, Skinner, had requested the prisoner to return the slave, and he had refused : or, suppose defendant had taken the boy from the service, for which he was obtained, to-wit, nursing his children, and had placed the boy to rafting logs. In both instances the contract of loan would have been determined, and the possession thrown upon Skinner, the owner (23 Ala. 534, and 18 *ib.* 348). A fraudulent conversion after this would have been a felony.

5. The loan was for an indefinite time, but, by virtue of law, terminated on the death of Skinner, the lender, and an administration of his estate (see Code, § 1724). And if a conversion is made after a completion or termination of the contract, it is felony.—Commonwealth v. James, 1 Pick. 385.

6. But it has been said by this court, that from the phrase-ology of this' statute, and the mischief intended to be pre-vented, it was the intention of the Legislature to create an offence essentially distinct from larceny at the common law. The possession of neither party makes any difference, if the slave is induced by persuasion to leave his master's service.— Mooney v. State, 8 Ala. 333 ; Williams v. State, 15 *ib.* 263.

7. As the charges in chief of the court are not set out, it does not appear how the prisoner has been injured as to the charge that charges in chief must govern where there is con-flict between them and special charges.

RICE, J.—To constitute the offence of larceny, according to the common law, there must be a taking from the possess-ion, a carrying away against the will of the owner, and a fe-lonious intent to convert the thing taken to the offender's use.—3 Chitty's Cr. Law 917.

According to section 3130 of the Code, " *any person* who in-veigles, steals, carries, *or* entices away *any slave*, with intent to convert such slave to his own use, or the use of another, or to enable such slave to reach a state or country where he would enjoy his freedom, must, on conviction, be imprisoned in the penitentiary not less than five or more than twenty years."

This section is, in substance, a transcript of a former statute, which had been examined and commented on by this court as long ago as 1845.—Mooney v. The State, 8 Ala. 328.

Experience had demonstrated, that the mere application of the rules of the common law, upon the subject of larceny, to slave property, was totally inefficient to protect this, the most valuable species of personal property owned in this country. To give the most ample protection to this kind of property, it became necessary to make a radical change in the common law. Slaves, being intelligent creatures, possessing volition, as well as the power of locomotion,—capable of being deluded by art and persuasion, as well as of being compelled by fear or force,—it was proper, in making the change of the common law, to resort to terms suited to the nature of the property intended to be protected. The section above cited was, there-fore, intended literally, as it is expressed, to embrace all who

should either "inveigle, steal, carry, *or* entice away any slave", with either of the intents therein expressed.—State v. Miles, 2 Nott & McC. 1; State v. Covington, 2 Bailey's Rep. 569 ; State v. Haskell, 33 Maine 127.

Where one man has carried away the slave of another, the question whether he is guilty of a felony or not, under section 3130 of the Code, depends on the intent with which it was done. The criminal intent, and the act denounced by that section, must both concur, to constitute a felony. If the slave was carried away by the consent of the owner, or of any person authorized to give such consent, such carrying away could not be a felony. So, if the carrying away was without any intent to deprive the owner of the subsequent use and benefit of the slave or of his value, it would not amount to a felony. So, if the carrying away was under an honest belief, in the mind of the person who carried away the slave, or caused him to be carried away, that he had the right to carry him away, or to cause it to be done, the person acting under such honest belief does not thereby become a felon, although he may be wholly mistaken in such belief. In short, whenever there is not clear and satisfactory proof of the felonious or corrupt intent denounced by the statute, concurring with the carrying away of the slave, there is no ground for a conviction for carrying away the slave.—Oliver v. The State, 17 Ala. 587.

We have selected the words " carry away", in the foregoing comments, for the sake of perspicuity ; and having begun upon them, we shall make no special comment on the other words, " inveigle, steal or entice away."

The following circumstances ought to be carefully considered, in construing the section above cited. At common law, *a taking* was essential to constitute larceny. Not so, as to all the offences created by this section. This omission in the statute of *a taking* is significant. At common law, certain persons (for instance, bailees), who had acquired possession of goods without any intent at the time to steal them, could not commit larceny as to such goods during the time for which they were by contract to keep possession of them, unless they broke the bulk or package. But this section makes no exception—it includes *"any persons"* who may do either of the acts denounced by it, with the felonious intent indicated by

its terms. It embraces the carrying away of "any slave", whether in the actual possession of the owner, or of a bailee, or in the mere constructive possession of the owner.

The property of the owner, in a slave hired or bailed by him to another, is recognized by law. There is as much reason for protecting it against the felonious carrying away of the bailee, as against the felonious carrying away of a third person. The law has established bounds between the interests of the bailor and bailee in the thing bailed. If the bailee transcends these bounds, and invades the rights of the bailor in the slave, by a carrying away of the slave, with the felonious intent expressed in the statute, he thereby incurs its penalty.

Conversion, and carrying away, are not synonyms, nor convertible terms. An unauthorized, illegal, and felonious carrying away of a slave necessarily includes a conversion. But a conversion does not necessarily include a carrying away. There may be a conversion, without any carrying away; and in that case, there is no felony, although the intent of the conversion is criminal.

In determining whether there has been a carrying away, the common-law rules in relation to the *asportavit* in larceny ought to govern,—with this qualification, that the bailment, or hiring, itself cannot be regarded as giving the consent of the owner to any *asportavit* of the slave by the bailee, when coupled with the felonious intent expressed in the statute, nor as authorizing any *asportavit* with such intent.—The State v. Covington, 2 Bailey's R. 569 ; 4 Black. Com. 231, and note 7.

Sound exposition requires effect to be given to every significant clause, sentence, or word in a statute. The common usage of the words at the time of the enactment is the true criterion by which to determine their meaning.—Smith's Com. on Stat. 630, 710.

The letter and spirit of the section in question seem to us to require the construction which we have above indicated. Any other construction would render at least some material part of the section utterly inoperative.—State v. Miles, 2 N. & McC. 1.

If there seems to be any hardship in this construction, we are not answerable for it ; the Legislature has so made the law, and we must give it effect. But we confess we see no-

thing very shocking in punishing any man, who by bailment has been entrusted with the use and possession of a slave, and who afterwards, in disregard of the bailment, carries him away with the corrupt intent of depriving the owner of his property in him, and of converting him entirely to his own use.

Even under the common law, it has been decided, that if a man steal his own goods from his own bailee, though he has no intent to charge the bailee, but his intent is to defraud the king, yet, if *the bailee had an interest in the possession, and could have withheld it from the owner, the taking is a larceny* (Rex v. Wilkinson, Russ. & Ryan's C. C. 470); and also, that if a *part owner* of property steals it from the person in whose custody it is, and who is responsible for its safety, he is guilty of larceny.—*Ib.* 478. Why, then, should it be thought harsh, for the Legislature to declare that a bailee might be convicted of felony, if he carried away a slave with either of the intents specified in the statute now under consideration? Is not such carrying away as flagitious an invasion of the right of property of the owner, as a taking from his actual possession and carrying away with the same criminal intent? Although the actual injury to the owner may not be quite as great in the one case as in the other, yet the injury, in legal contemplation, is equally clear in each case. And our opinion is, that both these cases are alike embraced by the letter, spirit, and intention of the section of the Code in question.

Under this construction of the statute, the error of that part of the main charge of the court which is set forth in the bill of exceptions, consists in its assertion, that the defendant was guilty, "if he had fraudulently and feloniously converted the boy to his own use", without referring to the jury the true question, whether he had carried away the slave with the felonious intent to convert him to his own use.

There was no error in refusing the charges asked by the defendant.

There is error in the charge which informed the jury, that, if they found that there was a conflict between the special charges asked by the defendant and given, and the main charge, then the latter must prevail. It was the legal right of the defendant to ask charges to be given. It was the duty of the court either to give or refuse them. If they were refused,

the defendant had the right to take his; exceptions, and obtain a revision of the refusals in this court. If they were given, the defendant was thereby deprived of his right of exception and revision. It is manifestly unjust, as well as unlawful, after the defendant's right of exception and revision has been taken away by the giving of his charges as asked, to tell the jury, that they ought to deny him any benefit from those charges "if they found that there was a conflict" between them and the main charge. Whether there was such a conflict, was a question exclusively for the court. If such a conflict existed, the court should either have withdrawn that portion of the main charge which conflicted with the special charge asked, or have refused the special charge. The court cannot avoid the decision of any question of this kind, by devolving that task on the jury.—Long v. Rogers, 17 Ala. 548; DeGraffenreid v. Thomas, 14 ib. 681.

There was no error in rejecting the proof which defendant offered to make by the witnesses Couch and Longmaster.—McBride v. Thompson, 8 Ala. 650; Thompson v. Mawhinney, 17 ib. 362; 17 ib. 109, 216, 314.

There was error in excluding the statement of Skinner which the defendant offered to prove by the witness Morton. It was a material question, whether the defendant honestly believed he had the right to carry away and sell the slave in the spring of 1854. If the defendant obtained the slave from said Skinner, and honestly believed that Skinner was the real owner, and as the real owner had conferred on him the right to carry off and sell the slave, and under such belief carried away and sold the slave, he is not guilty of any felony. In this point of view, it is clear that the statement of Skinner above referred to should have been allowed to go to the jury. We do not say, that the jury were bound to believe it, nor how much weight it was entitled to. We say it was admissible, and that the failure of the defendant to produce the paper, or account for its absence, did not render the statement of Skinner inadmissible. Such failure goes to the credibility, but not to the competency, of the testimony. Evidence is often competent, although entitled to little or no credit.

For the several errors of the court below, above pointed out, its judgment is reversed, and the cause remanded.