# LEHMAN, DURR & CO. *vs.* MARSHALL.

[TROVER FOR CONVERSION OF COTTON.]

1. *Custom; what not good.*—A custom in the city of Montgomery, among merchants, factors and planters, dealing in, or buying or selling cotton, that warehouse receipts to deliver to a certain person, or his order, or the bearer, the number of bales of cotton specified in said receipts, are transferable by delivery, as money or bank bills, without any indorsement, and that such transfer passes the cotton, without further inquiry or evidence of title than what arises from the possession of such receipts, unless notice is given that the receipts have been lost, or got into the hands of some one who is not the owner, or entitled to hold the same, is not a good custom.

2. *Crop; when may be subject of mortgage.*—A growing crop may be mort-

gaged, and when matured and gathered, if not before, the mortgagee is entitled to the possession, and may maintain an action to recover it, or its value.

3. *Note secured by mortgage; what contract as to note does not destroy effect of mortgage as security for note.*—A contract between mortgagee and mortgagor, that if the mortgagor will deliver, in the name of the mortgagee, at a warehouse to be named by him, a sufficient quantity of cotton, at a certain number of cents per pound, to pay the note secured by the mortgage, the mortgagee will accept the cotton in payment of the note, does not destroy the legal effect of the mortgage as a security for the note.

4. *Warehouse receipt for cotton; subject to order of storer, or bearer.*—A warehouse receipt for cotton, subject to the order of the person in whose name the receipt is given, or the bearer, is an admission that the cotton belongs to such person, and in an action to recover the cotton, or its value, it is no defense that it has been shipped and sold by direction of a party who had obtained possession of the receipt, without indorsement by the person stated to be the storer in the receipt, and without authority from him to dispose of the same.

5. *Usury; who only can set up defense of.*—The defense of usury can only be set up by a party to the usurious contract, or by some one having an interest in, or prejudiced by the same.

6. *Witness, misstatement of fact by; when jury may discredit whole testimony of.*—It is the province of a jury to determine the credibility of evidence, and, if conflicting, to reconcile it, if it can be reasonably done. If a fact is misstated by a witness, his evidence as to other matters is not to be altogether rejected, unless the jury believe the misstatement was wilfully and deliberately made, knowing it to be untrue.

APPEAL from the City Court of Montgomery. Tried before Hon. JOHN D. CUNNINGHAM.

This was an action of trover brought by appellee against appellants, to recover damages for the conversion of twenty-three bales of cotton, on the 1st of December, 1868.

The suit was commenced on the 8th of September, 1869, and at the October term, 1870, there was a jury trial and verdict in favor of the plaintiff.

From the bill of exceptions, it appears that G. W. Marshall, the plaintiff, on the 5th day of April, 1867, loaned to one Hamner, and McCoy and Turner, jointly, $1,300, to enable them to make a crop. To secure this loan, the borrowers jointly gave Marshall a mortgage on some personal property, and also on "their entire crop of cotton for the

present year." The mortgage itself does not show where the cotton crop was, or specify any land upon which it was to be grown; but it does appear from the evidence that the crop which was mortgaged was then planted on a plantation in Elmore county, which Hamner rented from one Holtzclaw, Hamner retaining and cultivating a portion himself, the remainder being sub-let to McCoy and to Turner, all of whom cultivated their several portions, each on his own account. The mortgage was duly acknowledged and recorded in Elmore county on the 4th day of May, 1867.

There was evidence that in the fall of 1867, the plaintiff agreed with Hamner, McCoy and Turner, if they would deliver in his name, at any warehouse in the cities of Montgomery or Wetumpka, to be selected by him, a sufficient quantity of ginned cotton, at eleven cents per pound, to pay said note and interest, he would accept the cotton in payment of the note, to which they agreed, and that plaintiff afterwards directed them to deliver the cotton at the warehouse of defendants, in the city of Montgomery; that before the 16th of December, 1867, Turner hauled twelve bales of cotton, six for himself and six for Hamner, all marked G. W. M., and stored them in the warehouse of defendants in the city of Montgomery, and took receipts from defendants in name of plaintiff. The first receipt was as follows:

"LEHMAN, DURR & CO.'S COTTON WAREHOUSE,

*Montgomery, Ala.*

| Marks. | Nos | W'hts. | Ropes. | MONTGOMERY, Dec. 5, 1867. |
|--------|-----|--------|--------|---------------------------|
| G.W.M. | 1 | 567 | | Received from G. W. Marshall |
| | 2 | 574 | | six square bales of cotton, marks, |
| | 3 | 612 | | &c., as per margin, subject to his |
| | 4 | 512 | | order, or the bearer of this receipt, |
| | 5 | 556 | | on paying the customary expenses |
| | 6 | 555 | | and advances. |

A. W. WILLIAMS,

For the Proprietors."

All the other receipts were like the above, except as to the weights, &c.

There was evidence that Turner hauled Hamner's six bales and stored them as aforesaid, and took receipts therefor as aforesaid by Hamner's direction, and stored and took receipts for his six bales as aforesaid, to comply to that extent with the agreement; and that Turner delivered the receipt for Hamner's cotton to Hamner, and the receipt for his cotton to McCoy, with instructions to deliver it to plaintiff; that Hamner also handed the receipt for his six bales to McCoy, to be delivered by him to plaintiff.

It was also in evidence that McCoy hauled to the same warehouse eleven bales of cotton, marked G. W. M., and took the defendants' receipts therefor. The dates of all the receipts were the true dates of the delivery of the cotton, and all said cotton was raised on said plantation rented and planted by said Hamner, McCoy and Turner. There was evidence that McCoy, on the 16th or 17th of December, 1867, delivered all said receipts to one Blum, then doing business in the storehouse of Loeb & Brother, in the city of Montgomery, with instructions to give them to Loeb & Brother, and that the cotton should be shipped to Lehman Brothers, New York, and the proceeds go to the credit of Loeb & Brother, and that the cotton was accordingly, on that day or the next after the receipts were delivered to Blum, shipped by defendants to Lehman Brothers, New York, under instructions from Loeb & Brother, and the said receipts were all delivered to the defendants; that McCoy took a receipt of some character relating to said cotton from Loeb & Brother, and offered it to plaintiff, who refused it, stating that he wanted the warehouse receipts for the cotton, and that McCoy immediately went to one of the firm of Loeb & Brother, and told him that he wished to see the receipts given by defendants—that there was some error in the receipt given by Loeb & Brother, and he wished to compare them—and this member of the firm of Loeb & Brother got the receipts from defendants and showed them to McCoy, who put them in his pocket and walked off, leaving the receipt of Loeb & Brother on the desk in their store, and went to the plaintiff, and delivered all the receipts of defendants to plaintiff.

It was also in evidence, that about the 5th of February, 1868, plaintiff demanded the cotton of defendants, producing their receipts therefor, and defendants went to Loeb & Brother, and Loeb & Brother told defendants not to settle for the cotton, and they would indemnify defendants against plaintiff's claim, and defendants refused to settle with plaintiff.

There was evidence of the weights of the cotton, and that at eleven cents per pound it did not quite pay the plaintiff's note and interest. The value of the cotton at the time of said demand was proved.

It was also in evidence that Lehman Brothers, New York, sold the cotton, and paid the proceeds through the defendants to Loeb & Brother, and that defendants had notice on the same day that McCoy carried off the receipts from Loeb & Brother that McCoy had so carried them off.

It was further in evidence, that another note bearing the same date, and written on the same piece of paper as the $1,300 note, was made by said McCoy, Hamner and Turner for the sum of $52, and there was evidence that this last note was given for usurious interest on the loan of said $1,300, but on this question of usury the evidence was conflicting.

There was evidence that the receipts were taken back by McCoy on the same day that he delivered them to plaintiff, but there was also evidence conflicting with this, and tending to prove that McCoy did not get them back and deliver them to plaintiff until several days had elapsed.

There was evidence that said Holtzclaw, before the delivery of said twenty-three bales of cotton at defendants' warehouse, had sued out an attachment in Elmore county against Hamner to collect his rent, and that a branch of said writ had been sent to Montgomery county, and was in the hands of an officer in the city of Montgomery, who was watching for cotton raised on said plantation to levy said writ thereon, and while said writ was in the hands of said officer in said city, the said twenty-three bales were delivered at defendants' warehouse, and that said Hamner

afterwards compromised Holtzclaw's demand for rent by delivering to him twenty bales of cotton, six of which were marked G. W. M., and this compromise was made previous to the 1st day of January, 1868. There was no evidence that the plaintiff had anything to do with the marking of last said six bales as aforesaid, or knew anything about it.

It was in evidence that the plaintiff formerly resided in the same neighborhood as his present residence in Elmore county; that he resided there for fifteen years immediately. preceding and until just after the war in 1865, when he moved to Texas, and in the fall of 1866 returned and settled where he now resides; that his former residence was fifteen miles from the city of Montgomery, and six miles from the city of Wetumpka, and planted and sold cotton; that plaintiff did his principal business and trading in Wetumpka, and still does; that during the period of his said residence before the war he was frequently in Montgomery, and on one occasion before his removal to Texas. he made a bill of goods with Robinson & Wright, merchants in Montgomery, and brought some cotton to Montgomery and got Robinson & Wright to sell it for him and pay. themselves from the proceeds; and this transaction of plaintiff in the city of Montgomery was many years ago.

It was in evidence that plaintiff's residence since his return from Texas had been in Elmore county, about fifteen miles from Montgomery and ten miles from Wetumpka, and that he was and had been a cotton planter.

It was also in evidence, that at the time McCoy delivered said receipts to Blum, McCoy owed Loeb & Brother $1,510.56, Turner owed them $3,187.47, and Hamner owed them $1,269.60, besides interest on these sums.

It was in evidence, that the neighbors of plaintiff in 1866 and 1867 traded in Montgomery and sold their cotton in Montgomery.

The defendant then offered evidence tending to prove that it was then, and had been for more than twenty years last past, the common and general usage and custom of trade in said city of Montgomery with merchants, factors,

and planters dealing in or buying or selling cotton in said city, that cotton receipts in the form of those offered in evidence, agreeing to deliver to a certain person, or his order, or to the bearer of the receipt, the number of bales in the receipt specified, were transferable by delivery as money or bank bills, without any indorsement, and passed the cotton specified in such receipt without any further inquiry or evidence of title than what arises from the possession of said receipt, unless notice was given that the receipt had been lost, or had got into the hands of some one who was not the owner, or entitled to hold the same.

And on the motion of plaintiff, the above testimony as to the usage and custom aforesaid was excluded from the jury; to which action of the court the defendants excepted. Upon this evidence, as shown in the bill of exceptions, the court, on motion of the plaintiff, excluded from the consideration of the jury all the evidence which had been offered to prove such usage and custom of trade; to which exclusion the defendants excepted.

This was the substance of all the evidence relating to the errors assigned.

The plaintiff asked, among other charges which were refused, the following charges, which were given:

"1. If the jury are satisfied from the evidence that the plaintiff lent to McCoy, Hamner and Turner thirteen hundred dollars, and they gave him therefor the note of $1,300 in evidence, and that to secure the payment of said note they executed to him the mortgage offered in evidence, and said mortgage was recorded in the office of the probate judge of Elmore county, on the 4th day of May, 1867, and the cotton stored in the warehouse of defendants, for the conversion of which this suit is brought, was produced on the plantation cultivated by the makers of said note and mortgage in the year 1867, and this plantation was situated in Elmore county, and the said cotton, the subject of this suit, was delivered to the defendants and stored in their warehouse, in the city of Montgomery, in the name of the plaintiff, then the title to said cotton was in plaintiff; and if the said cotton was shipped by said defendants to

New York without the authority or consent of the plaintiff, either on their own account, or on account of Loeb & Brother, before this suit was brought, the plaintiff is entitled to a verdict, unless they are satisfied from the evidence that by some act of the plaintiff, or some act done by his authority, this title was divested.

"2. If the jury are satisfied from the evidence that the plaintiff had a title to the cotton for the conversion of which this suit is brought, under his mortgage, and it was agreed between him and the makers of the note to secure which the mortgage was made, that if they would deliver in his name, at the warehouse of defendants in Montgomery, a sufficient quantity of cotton in bales to pay said note at eleven cents per pound, he would accept the same in payment of said note, and if they did deliver the cotton in plaintiff's name, as agreed on, to the defendants at their said warehouse, then such delivery vested the title to the cotton so delivered in the plaintiff, and this title can not be divested out of the plaintiff, unless by some act done by him, or by his authority.

"3. That unless the jury are satisfied from the evidence that McCoy delivered the cotton receipts to Blum, or Loeb & Brother, by the authority, or with the consent of the plaintiff, such delivery can not affect the plaintiff, if the title to the cotton was in the plaintiff.

"4. If the debt of the makers of the note in evidence was in fact owed by them, and the cotton for the conversion of which this suit is brought, was delivered to defendants at their warehouse, by said makers, to pay said note, under an agreement between them and the plaintiff that he would receive the cotton in payment of said debt, and was stored in the name of the plaintiff, and the receipts were given in his name, then the title to said cotton vested in the plaintiff, and the terms of the receipt can not authorize the defendants to deliver the cotton to another person, the holder of the receipts, or to ship the cotton to the order of the said third person, unless said receipts were delivered to the said third person by the authority or consent of plaintiff.

"5. That the possession by McCoy of the two receipts for twelve bales of cotton, if they were delivered to him by Turner to hand to plaintiff, and the possession of the other receipt for eleven bales of cotton, unless the receipts were delivered to him by the plaintiff, did not constitute McCoy the agent of plaintiff to dispose of said receipts, or any of them, to any person, or for any purpose, and his delivery of said receipts to Blum for Loeb & Brother, or to Loeb & Brother, can not bind the plaintiff, unless the jury are satisfied from the evidence that the plaintiff had authorized McCoy so to dispose of these receipts.

"7. That in the matters set up by defendants as a defense to this suit, the burden of proof lies on the defendants, and the jury must be satisfied from the evidence that those facts relied on as defense have been severally established as relied on, according to what the court charges are defenses in this suit.

"10. That although the plaintiff in lending the money secured by the $1,300 note, if he did so lend it, reserved or took usurious interest at the rate of 16 per cent., or other rate, this fact can not affect the rights of the plaintiff in this suit, and can not be considered by the jury by itself, or in connection with any other facts of the case, in arriving at their verdict.

"11. If there is any apparent conflict in the testimony of the witnesses, it is the duty of the jury to reconcile this testimony upon any hypothesis they believe to be reasonable, but the law will attribute to a witness a want of recollection, or mistake, rather than a deliberate falsehood.

"13. That if the cotton receipts were given in the name of the plaintiff, this was notice to Loeb & Brother of the claim of plaintiff to the cotton, if Loeb & Brother received those receipts at the time of the receipt; and if Blum, as the agent of Loeb & Brother, ordered the cotton shipped, and proceeds to go to Loeb & Brother, and they received the proceeds, and have indemnified the defendants against this suit, and if the plaintiff, at the time said receipts were given, had the title to said cotton, then the verdict must be for the plaintiff, unless they are satisfied from the evidence

that the plaintiff, by some act done by him or by his authority, had divested himself of the title.

"14. If the jury are satisfied from the evidence that the $1,300 note in evidence was given for a loan of money by the plaintiff to that amount, and that the mortgage in evidence was given to secure the payment of said note, at the time of its date, and that said mortgage was recorded in the office of the judge of probate of Elmore county, on the 4th of May, 1867, and that the cotton for the conversion of which this suit is brought, was produced in the year 1867, on the plantation planted by the makers of said mortgage, in Elmore county, and the defendants shipped said cotton to New York without his authority or consent, then the plaintiff is entitled to a verdict, unless the jury are satisfied by the evidence that the plaintiff and the makers of said note agreed that if said makers of said note would deliver at defendants' warehouse, in Montgomery, enough cotton, at eleven cents per pound, to pay said note, the cotton to be stored in his name; and unless they further believe from the evidence, that the makers of said note did so deliver a sufficient quantity of cotton to pay said note, principal and interest, but if, on calculating the principal and interest due at the time of the delivery of the cotton, and the value of the amount of the cotton so delivered at eleven cents per pound, there is a balance still due on said note, no matter how small, the plaintiff is still entitled to a verdict, unless by some act done by him, or his authority, he discharged or released his right to said cotton as held by him under his said mortgage.

"15. That although a witness may mistake a fact in his evidence, yet the jury are not bound to reject his testimony as to all other parts, unless they believe the witness has sworn a deliberate falsehood as to some fact."

To the giving of each of these charges defendants excepted.

The errors assigned are, exclusion of the evidence of custom, and the charges given.

RICE, CHILTON & JONES, and JUDGE & HOLTZCLAW, for

appellants.—(Appellants' brief did not come into Reporter's hands.)

ELMORE & GUNTER, *contra.*—Most of the cases in which evidence of a custom has been allowed, were upon mercantile contracts; but even in those cases, parol evidence of a custom is not always admitted. If it "can be heard by the court consistently with the rules which have been established for the ascertainment of truth," then it will be admitted. If the terms of the contract are all expressed, and have a plain ascertained meaning, then to permit evidence of a custom would violate the rule that parol evidence shall not be admitted to vary, add to, or explain the written contract.—*Sampson v. Lindsay & Gazzam,* 6 Port. 123.

In the case of the schooner *Reeside,* in 2 Sumner's Reports, Judge Story lays down the rule as follows: That the appropriate office of a usage or custom is to interpret the otherwise indeterminate intentions of parties, and to ascertain the nature and extent of their contracts arising, not from express stipulations, but from mere implications and presumptions, and acts of a doubtful or equivocal character; and he denies that it can ever be proper to resort to any usage or custom to control or vary the positive stipulations in a written contract, and *a fortiori,* never in order to contradict them.—See, also, 12 Ala. 349; ib. 513; 17 Ala. 744; 23 Ala. 420; 27 Ala. 77; 25 Ala. 472; 9 Ala. 566; 28 Ala. 704; 32 Ala. 617.

In 32 Ala. 621, the court says: "In all cases of mercantile contracts, which are partly express and in writing, and partly implied and oral, a distinction is established on the soundest principles, that evidence received must not be of a particular which is repugnant to or inconsistent with the written contract."

In *Smith & Holt v. Mobile Nav. and Mutual Ins. Co.,* 30 Ala. 167, the court held that the words "beginning the adventure upon the said goods and merchandises from and immediately following the loading thereof on board the said vessel or boat at New Orleans aforesaid," could not,

by evidence of a custom, be explained to mean that the risk began with the transportation on the road, and before the goods were put upon the boat.

So, in *Thorpe v. Sughie*, 33 Ala. 330, parol evidence was not allowed to explain that the words, "the said house is to be furnished with gas," as used in the lease, meant that the landlord should apply gas fixtures, and not that he should pay for the gas consumed.

The evidence of this custom would either have varied the contract in an essential particular, and was, therefore, on the principles above educed, properly rejected, or the custom, as proposed to be proved, corresponded with the contract; and in this latter view the rejection of the evidence was without injury to the appellants, and, in either view, the testimony was properly rejected. If the evidence was admissible, still it was necessary to bring home to Marshall notice of the custom, and should have been offered in connection with proposed testimony to charge Marshall with this notice. This was not done, and there was no testimony tending to bring home to him such notice. He had but one transaction prior to this, in cotton, in the city of Montgomery, and the sale of this was effected by his creditor for him, and this single transaction occurred many years ago. His general dealings while he was in the State were transacted in Wetumpka. There was no evidence of any dealings, in any way, by him, in Montgomery, except that with Robinson & Wright, and this comprised a single bill of goods. He lived fifteen miles from Montgomery, and nearer to Wetumpka. Knowledge of the custom, by him, can not be presumed. It was not a general, but a local custom. In *Fulton Ins. Co. v. Milner et al.*, 23 Ala. 420, the parties all resided in the city where the custom prevailed, and were presumed to contract with reference to it. "If the usage is purely local, still if notice of the existence is brought home to the parties, they will be bound by it, and, unless otherwise provided in the policy itself, it will form a part of the contract of insurance," &c. If the party who is sought to be bound by the custom does not reside in the place where it exists, then

·evidence of notice to him of the custom must be offered to bind him thereby. None such was offered, and none proposed to be introduced.

The receipts were given in the name of Marshall, and were notice to all persons that he, or some one for him, had stored the cotton in the warehouse of appellants, and that the cotton so stored was once his cotton, and that the title thereto was still in him, unless some act had been done by him, or by his authority, to divest him of that title, and that the possession and transfer of the cotton receipts by any person would not pass Marshall's title to the cotton, unless it was done by his authority.

The effect of such a custom would be to deprive the owner of his title to cotton if the receipts should be stolen from him. It is no answer to this, to say that the owner should give notice to the warehouseman of the loss, because, if the receipts passed as bank bills, the first man who obtained them from the thief would be the owner, and the warehouseman could not resist his claim; nor would a publication in the papers be sufficient, because the thief might deliver them before the papers are published.

Independently of the above question, under the evidence and the law, as charged, the appellee was entitled to a verdict.

The evidence shows that Hamner, McCoy and Turner borrowed $1,300 of Marshall, and gave him their note and a mortgage on their crop of cotton, then planted in Elmore county, to secure the note. The mortgage was duly recorded. The cotton delivered to the appellants was part of the cotton crop mortgaged. This cotton was not removed from Elmore county until December, and at the time it was shipped by the defendants, was covered by the mortgage; unless by the agreement made as to the delivery at the warehouse, between Marshall and his mortgagors, the mortgage was discharged. The evidence showed this agreement to be, that if they would deliver to appellants' warehouse in Montgomery, cotton enough, at eleven cents per pound, in appellee's name, to pay the debt, he would accept the cotton as a payment.

The evidence further shows that there was not quite enough cotton delivered to pay the note. Unless the note was paid, Marshall had a right to refuse the cotton, as the agreement had not been complied with, and to rely on his mortgage and his title thereunder, or he could have accepted such delivery as a payment *pro tanto*. In either event the title was in him, and he had done nothing to divest the same. If it be said there was no consideration for the agreement to deliver the cotton, the answer is, that the promise to deliver, the delivery being the transportation of the cotton for some fifteen miles, is a valuable consideration. But whether there was a consideration for the agreement or not, it was executed, and this passed the title upon delivery at the warehouse.

The usury alleged to have been received for the loan of the money was no defense. It would have been no defense to McCoy, Hamner and Turner if an action of detinue or trover had been brought by Marshall against them for the cotton. They might have gone into chancery to make Marshall cut down his claim, but then he would have obtained the principal and legal interest; but the usury would have been no defense in a suit at law for the cotton, based on his title through his mortgage.

These appellants can derive no benefit from the usury. The defense is a personal one to the borrowers, and can not be made by third parties.

The attachment of Holtzclaw, for rent, had still less to do with the case. The appellants derived no title through him, or any claim to the cotton, and he himself had no title or claim of title. He had not even a lien on it until he had levied his attachment.

PECK, C. J.—1. The evidence offered by appellants (defendants in the court below) to prove the alleged custom in the city of Montgomery, was properly rejected. None but good customs have any validity. A custom that has a tendency to tempt parties to acts of wrong doing, bad faith, or dishonesty, can not be a good custom. A bad

custom ought to be abolished. *Malus usus est abolendus.*
1 Wend. Blackst. 76.

It is certainly an act of bad faith and dishonesty for a
party intrusted with a warehouseman's receipt for cotton,
to be handed to the owner, to transfer it by delivery to a
third person, without the owner's knowledge or consent.
The offer to prove this custom was an admission that such
instruments could not be transferred by delivery, either by
the common-law, or the law-merchant; and that is un-
doubtedly the case. Furthermore, this alleged custom is
inconsistent with the spirit, if not with the letter, of sec-
tion 1838 of the Revised Code, which provides that "all
bonds, contracts and writings for the payment of money,
or other thing, *or the performance of any act or duty*, are
assignable by indorsement." A warehouseman's receipt is
a contract· for the performance of a duty, and, therefore,
can only be assigned by indorsement.—*Skinner v. Bedell's
Adm'r*, 32 Ala. 44; *Henley v. Bush*, 33 Ala. 636.

2. A growing crop may be mortgaged, and when matured
and gathered, if not before, the mortgagee is entitled to
the possession, and may maintain an action to recover it,
or its value.—*Adams v. Turner & Horton*, 5 Ala. 740.

3. The contract between the mortgagee and mortgagors
in the fall of 1867, that if the mortgagors would deliver, in
the name of the mortgagee, at a warehouse in the city of
Montgomery, or Wetumpka, to be selected by the mort-
gagee, a sufficient quantity of ginned cotton, at eleven
cents per pound, to pay the note secured by the mortgage,
the mortgagee would accept the cotton in payment of the
note, did not destroy the legal effect of the mortgage.
Such was manifestly not the intention of the parties. At
most, it only amounted to an agreement to receive cotton
at eleven cents per pound, if delivered, in payment of the
note, instead of money, extending the time of payment to
the end of the fall, but the mortgage still remained a secu-
rity for its payment.

4. As between the plaintiff and defendants, the receipts
copied into the bill of exceptions were an admission, on
the part of the defendants, that the cotton belonged to the

plaintiff, *(Kennedy, &c., v. Strong,* 14 I. R. 128,) and it was no defense that it had been shipped and sold by direction of parties who had obtained possession of the receipts from a person who had no legal right to indorse or dispose of them.

5. The defense of usury can only be set up by a party to the usurious contract, or by some one having an interest in, or prejudiced by, the same. The defendants were not parties to the contract alleged to be usurious, had no interest in it, and had not in any wise been injured or prejudiced by it, and, therefore, could not make it a defense to this action.—*Cook & Kornegay v. Dyer,* 3 Ala. 643.

6. It is the province of a jury to determine the credibility of evidence, and if conflicting, it is their duty to reconcile it, if it can reasonably be done. If a fact be misstated by a witness, his evidence as to other matters is not to be altogether rejected, unless the jury believe the misstatement was wilfully and deliberately made, knowing it to be untrue.—*The Sanctissama Trinidad,* 7 Wheat. 338-9.

Taking these principles as the law of this case, we do not discover any available error in the charges given by the court, and excepted to on the part of the defendants.

The judgment of the court below is affirmed, with five per cent. damages. The appellants will pay the cost.

[NOTE BY REPORTER.—After the delivery of the foregoing opinion, appellants' attorneys applied for a rehearing, and made the following argument in support thereof:]

Petitioners respectfully urge, that by the rulings of the court below, they were plainly deprived of an important provision of a valid and lawful contract, without any fault, or bad faith, or breach of contract, or breach of duty on their part; and were held responsible for the misconduct of plaintiff's own agent, of which they had no notice when they exercised their right secured by contract to deliver the cotton to the order of "the bearer" of the cotton receipts, (which are in law contracts.)—*Bush v. Bradford,* 15 Ala. 317.

Bad usage is not insisted on by petitioners. Let all mere usage be put aside.

Petitioners, however, do insist that no court ought to deprive them of the benefit of any portion of a lawful contract.

Petitioners insist that no court ought to treat the contract (evidenced by the cotton receipt,) precisely as if it did not contain the words, "or to the bearer of this cotton receipt." The law of the land does not deny effect to such plain words when found in a lawful contract.

The supreme court, in the opinion delivered, entirely overlooked the plain and rational distinction between the case where there is "an express agreement to return the property to the plaintiff," and the case where, as here, the agreement is evidenced by a receipt, and is, that the bailees receive the thing bailed from the plaintiff expressly "subject to his order, or the bearer of this receipt."

In the case where the express agreement of the bailee is to deliver to the plaintiff, and nothing is agreed or said as to delivery to the bearer of the agreement, or other person, the delivery by the bailee, through mistake or negligence, to another person, without the consent or authority of the plaintiff, is a conversion, and renders the bailee liable. That was precisely the case in *Esmay v. Fanning*, 9 Barb. 190. And that is the principle asserted in sections 414 and 450 of Story on Bailments, and in the cases cited in the notes to those sections.

But when, as here, the agreement is different, a different principle or rule must govern the case. A bailee certainly has the legal right to agree with the bailor, that the bailee shall have the right to deliver the thing bailed either to the bailor or to "the bearer" of the written agreement or receipt. This was the very agreement which the parties to this suit did make, and did reduce to writing. There was no fraud in this written agreement. This written agreement is a lawful and binding contract, and is the sole expositor, the conclusive evidence, of the terms of their contract.—*Cole v. Spann*, 13 Ala. 537.

Yet, the plaintiff is permitted to recover in the very teeth

of this lawful contract. Yes, he is permitted to recover, simply because the bailees did precisely what this lawful contract secured them the right to do, that is, delivered the thing bailed to "the bearer" of the written agreement or receipt.

In the class of cases first above noticed, (and of which *Esmay v. Fanning*, 9 Barb. 190, is one,) the bailee was held liable for making a delivery not provided for in the contract; for delivery to some other person, when his express contract required a delivery to the bailor, and made no further provision as to delivery. His liability arose from his going beyond and outside of the contract.

But in the present case the bailees have not gone beyond or outside of their written contract; they have made no delivery which was not clearly provided for and authorized by their written contract; and yet, for an act clearly within the limits of their contract, and clearly authorized by it, they are held liable for a large sum in favor of their bailor. Reason, justice, principle and authority all forbid such a thing.

Though the written contract here is in the form of a receipt, it is not a mere receipt; it is a contract, a contract between competent parties, and lawful in every respect. *Bush v. Bradford*, 15 Ala. 317, and cases there cited.

It is a contract which certainly secured to the bailees "the option" to deliver to "the bearer" of the contract, or to his order ; and it is settled, that "a contract may be optional with one of the parties, in part or in whole, and obligatory on the other."—*Disborough v. Neilson et al.*, 3 Johns. Cases, 81; Doug. 23, 1 Term Rep. 132–33; Cowp. 218 ; *Giles v. Bradley*, 2 Johns. Cases, 252; see, also, cases cited in last sentence of opinion on page 63 of *Murrell v. Whiting*, 32 Ala.

It is of the highest consequence to all the people, that courts of justice should hold all parties to contracts lawfully made by them, as they made them; that courts should not practically expunge any part or term of such contracts by refusing to allow any effect to it, or by any other way of treating the subject.

The contract here under consideration is one of a class vast in number, and involving vast amounts of money. It is written in plain and unambiguous language. The plaintiff himself here treats it as a valid contract. The defendants have never violated that contract as it was made, written, delivered and accepted. No violation of that contract by defendants can be made out, without first practically expunging from it the words "or the bearer of this receipt."

With all deference it is urged, that courts of law have no authority or jurisdiction to thus practically expunge from such contract such plain, lawful, and important provisions. To do this, is really to make for these defendants a new contract, and one they never made and were never willing to make.

The error in the opinion of the court is, in treating this contract precisely as if it did not contain the important words, "or the bearer of this receipt."

If the contract did not contain these words, then the delivery to a third person would be a conversion. But as the contract does contain those words, the cotton was plainly just as "subject" to the order of "the bearer of this receipt," as it was to the order of the plaintiff himself. To deny this, is nothing short of denying to these parties the right to insert in their own contract such lawful terms and stipulations as they choose.

If the rulings of the court below are to be affirmed as good law, then logic demands that the affirmance should be accompanied by the following head note:

"A warehouseman who, for cotton stored with him, signs and delivers therefor a contract in writing in the form of a receipt, wherein he states that he has received the cotton from its owner, (naming him,) 'subject to his order, or the bearer of this receipt,' becomes guilty of conversion, and liable in trover to the owner, by the bare exercise of his contract right to deliver the cotton to 'the bearer of this receipt,' or to his order. The exercise of this contract right is, *per se*, a breach of the contract, and makes the warehouseman guilty of a conversion *(a tort)*."

Any close examination of this contract, and of section 1838 of the Revised Code, must result in convincing every judge that there is nothing in that section which has, or can have, the slightest bearing upon, or application to, the present case. True, the contract here is one "for the performance of an act or duty;" true, this contract is "assignable by indorsement;" true, no other person than plaintiff can, in his own name, maintain an action upon the contract itself, without assignment or indorsement of that contract by the plaintiff. But admitting all this, yet the plaintiff has never assigned this contract by indorsement, and no one but the plaintiff is here sueing; and the plaintiff himself is not sueing upon the contract itself, but is sueing for a supposed *tort*. He can not possibly recover without showing that the delivery to "the bearer" of the receipt was a breach of the contract.

Even if the plaintiff had assigned or indorsed the contract to a specified third person, that act of plaintiff could not expunge from the contract the option thereby secured to defendants to deliver the cotton to "the bearer" of the receipt. This option of the defendants, thus secured by their written contract, is not affected by anything contained in section 1838 of the Revised Code, nor by any other section of that Code; nor can that option of defendants be destroyed or impaired by any act of the plaintiff proved or brought to view in this case.

Now, no fair man ever disputed that the contract was an admission by defendants that the cotton did belong to the plaintiff at the time the contract was made. But surely, it ought not to be claimed that it was an admission also that it would continue to be the property of plaintiff forever. A like admission implied from a replevy bond, was held not to conclude the party as to the actual facts twenty-four days afterwards.— *Wallis v. Long*, 16 Ala. 738.

Suppose a banker, on the 1st day of January, 1872, received the money of A, and on that day executed to him a certificate of deposit, stating that the money so deposited was "subject to the order of A, or the bearer of this certificate." Suppose A loses the certificate, and it is found

by B, and that on the 24th of January, 1872, B presents the certificate to the banker, who, without notice from A forbidding payment to any person but himself, pays the money to B : can any lawyer contend, upon such facts, that the banker is thereby guilty of a conversion, or that he remains liable to A? Of course not. The banker has paid the money to "the bearer of the certificate," as authorized to do by its terms, and that payment was clearly good, because A, after losing the certificate, did not prohibit payment to any person but himself.

The plaintiff in this case did not prohibit the defendants from delivering the cotton to "the bearer of the receipt;" he gave no notice to the defendants that there was any wrong in delivering to such "bearer;" and in the absence of all such notice, the defendants delivered to the order of "the bearer of the receipts." The contract authorized this delivery, and therefore such delivery was neither a *tort* nor a conversion.

The assignability of the contract has nothing to do with this case. The contract itself, upon its face, secured to defendants the right to discharge it by a delivery to "the bearer" of the contract. This right was exercised, without notice from plaintiff forbidding such exercise. There is no law of this land which makes the defendants tort-feasers for such exercise of their right secured by contract. It is a legal impossibility, that any party to a lawful contract can become a tort-feaser by simply exercising the very right secured to him by the contract. And this is true, whether the contract be assignable or not.

No negligence is shown against the defendants. No breach of contract is shown. No bad faith is shown. In good faith, and without negligence, they delivered the cotton to "the bearer" of the receipts, in strict accordance with their contract. It is confidently believed that there is not a principle or an adjudged case which declares warehousemen liable on such facts.—*Runyan v. Caldwell*, 7 Humph. 134; *Willard v. Bridges*, 4 Barb. 561.

The contract itself secured the right to defendants to make this delivery to "the bearer." This right certainly

continued of full force until the plaintiff might give notice to defendants not to deliver to "the bearer." No such notice was given, nor anything of the kind. In the absence of such notice, the plaintiff must be the loser by any misconduct of his own agent. He can not hold the defendants responsible for the misconduct of his own agent, of which misconduct the defendants had no notice when they delivered the cotton to "the bearer" of the receipts. *Nelson v. Iverson*, 17 Ala. 216.

The several rulings of the court below are in conflict with the sound principles and positions above stated. The charges given to the jury rendered it impossible for the defendants to have "a trial by jury," upon the very matters on which the law of the land made the liability of defendants to depend. The charges make them liable simply for delivering to "the bearer" of the receipts, without fault, bad faith, negligence, or notice from plaintiff that he did not wish such delivery made.—*Nelson v. Iverson, supra.*

The attempt to prove the custom in the court below was cumulative, and no waiver of the rights of appellants under the contract.

In *Ray v. Wragg et al.*, decided at this term, this court uses the following language: "In construing contracts, the intention of the parties will be carried into effect so far as the rules of language and the rules of law will permit. A court would not, by construction of a contract, defeat the express stipulations of the parties."

Yet, in the present case the court has, by construction of a contract, defeated one of the "express stipulations of the parties."

The contract here expressly stipulates that the cotton shall be "subject" to the order of "the bearer of this receipt," or to the order of the plaintiff. The court says, no, the cotton shall not be subject to the order of "the bearer of this receipt," but shall be subject only to the order of the plaintiff.

The court, in this case, disregard that sound and universal rule of "sound exposition" which imperiously demands that such construction shall be put upon a written con-

tract, or any other written instrument, as allows some meaning, operation and effect to every word and clause thereof, rather than a construction which silences or denies effect to any clause or word thereof.—Smith on Stat. 710; *Spivey v. The State,* 26 Ala. 101; Smith on Contr. 407-8, marg., where "the most important-of all the rules of construction" is stated and elucidated.

BY THE COURT.—The application for a rehearing is denied.