# Allen, Bethune & Co. *v.* Maury & Co.

*Trover against Warehousemen, for Conversion of Cotton.*

1. *When title passes under contract for sale of goods.*—Under a contract for the sale of goods, if any thing remains to be done by either party before delivery, as to determine the price, quantity, or identity of the thing sold, the contract is merely executory, and the title does not pass to the purchaser; but, under a contract for the sale of several hundred bales of cotton at a stipulated price, the purchaser reserving the right to inspect and re-weigh it, and to reject such bales as may be found to be falsely packed, the title passes when the cotton is delivered, the warehouse receipts surrendered, and the price paid, except five dollars per bale which, by the terms of the contract, was retained by the purchaser as security on account of the bales which might be found to be falsely packed.

2. *Warehouse receipts for cotton, and assignment thereof.*—A warehouseman's receipt for cotton "is not, in any technical sense, negotiable;" it merely stands in the place of the cotton, and a delivery of it has, in the absence of statutory provisions regulating its transfer, the same effect in transferring the title to the property as a delivery of the property itself.

3. *Same; fraud in procuring.*—When warehouse receipts for cotton are taken by a purchaser in his own name after examination and re-weighing, an indorsement of them would be necessary to convey the legal title to another (Code, § 2099); but if, having the right to reject any bales found to be falsely packed, he takes new receipts for the rejected bales in the name of his vendor, to whom he delivers them on a subsequent settlement, such delivery is a symbolical delivery of the cotton itself; and though their delivery was procured by fraud on the part of the vendor, having made the settlement with the preconceived intent to intercept the payment of the bank check given for the balance found against him, this fraud would not affect the title of a subsequent assignee for valuable consideration without notice.

4. *Same; estoppel en pais.*—As between the original purchaser of the cotton and the *bona fide* holder of the warehouse receipts, in such case, the doctrine of estoppel applies, on the principle that, when one of two innocent persons must suffer by the fraud of a third person, the loss must fall on him who, by the trust and confidence reposed in the deceiver, enabled him to perpetrate the fraud.

Vol. LXVI.

APPEAL from the City Court of Montgomery.

Tried before the Hon. JOHN A. MINNIS.

This action was brought by J. H. Maury & Co., suing as partners, against Allen, Bethune & Co., warehousemen in the city of Montgomery, to recover damages for the alleged conversion by the defendants of *nine*(?) bales of cotton, the property of plaintiffs; and was commenced on the 14th January, 1879. The facts of the case, as proved on the trial, are thus stated in the bill of exceptions:

"The testimony tended to show that, in October, 1878, Munter & Brother, a mercantile firm doing business in the city of Montgomery, were the owners of five or six hundred bales of cotton, bought by them from planters, and stored as bought in the warehouses of the city, that of Allen, Bethune & Co. among others, who were doing a warehouse and shipping business in said city, and who, from time to time, issued warehouse receipts to said Munter & Brother, for the cotton received, in substance as follows." (The receipt is in the usual form of warehouse receipts; acknowledges the receipt of — "bales of cotton from wagons for Munter & Brother, marks &c. as per margin, subject to this receipt or order, on paying all expenses and advances"; and is signed by Allen, Bethune & Co.) "A large number of bales—two hundred or more—were received by Allen, Bethune & Co. from Munter & Brother during the month of October, 1878, and receipts given for the same as above stated, varying in the number of bales from one to fifteen. While the cotton was so stored in the defendants' warehouse, during said month of October, 1878, the plaintiffs, who were cotton-buyers in the city of Montgomery, made a bargain with said Munter & Brother for the purchase of five or six hundred bales in different lots, and at different times, ranging from forty to one hundred bales in a lot; the cotton being in several warehouses in the city, stored in the name of Munter & Brother, and receipts given similar to the one above copied. The samples of each bale were exhibited, and the price agreed on; but plaintiffs reserved the right to inspect and re-weigh the cotton, and to reject all such bales as might be found, on such inspection, to be sand-packed, seed-packed, or water-packed; and, to cover the value of any such rejected bales, plaintiffs had the right to retain five dollars per bale of the agreed price of the whole lot. Thereupon, plaintiffs paid to said Munter & Brother the agreed price, reserving the five dollars per bale in some cases, and not reserving it in others; and Munter & Brother delivered to them the warehouse receipts for the cotton so bought and paid for, and it was re-weighed, and turned out of the warehouse into the street, for examin-

ation and shipment. When the cotton was turned out, the original receipts issued to Munter & Brother were surrendered to the warehousemen. Of these various lots thus turned out for inspection and shipment, a number of bales were rejected by plaintiffs, on the ground that they were sand-packed, seed-packed, or water-packed; and these rejected bales were returned to the warehouse, and were stored by the warehousemen for account of plaintiffs, and so entered on their books; but a new receipt was issued in the name of Munter & Brother, showing the number of bales thus returned to the warehouse, and the original marks of the cotton as entered on the first receipt, being identical with the original receipts, except as to number of bales; and these new receipts were delivered by the warehousemen to plaintiffs. Of the bales thus rejected and re-stored, and for which new receipts were issued, seven were thus stored in the warehouse of the defendants.

"Plaintiffs rejected in this way, or claimed the right to reject, a larger number of bales out of the various lots purchased, than Munter & Brother admitted they had the right to reject under the terms of the agreement of sale; and cotton having declined in price during the month of October, Munter & Brother claimed that they had been damaged by delay on the part of plaintiffs in making up the account, and returning the rejected cotton; and on the 30th October, in the afternoon, after the banks had closed for that day, M. Munter, one of said firm, went to plaintiffs' office, to settle the matter. After some controversy, plaintiffs agreed to retain all the cotton but thirty-one bales, seven of which were stored in the defendants' warehouse, and Munter admitted their right to reject said thirty-one bales; and the account between plaintiffs and said Munter & Brother, on the basis of the rejection of said thirty-one bales, was made up by plaintiffs' book-keeper, and showed a balance due plaintiffs of $1,062. Thereupon, Munter gave plaintiffs a check for that amount on the Merchants' and Planters' National Bank; and plaintiffs delivered to said Munter the warehouse receipts for twenty-seven of the thirty-one bales, and orders on the warehouses for the remaining four bales, for which no new receipts had been issued. Munter stated to plaintiffs' book-keeper, with whom the settlement was closed, that he protested against it; but he took the warehouse receipts for said twenty-seven bales, including the seven stored in the defendants' warehouse, and the orders for the other four bales, and left the plaintiffs' office, and went immediately to see A. B. Peck, the president of said M. & P. Bank, and told him that he had given said check, but that he did not want

[Allen, Bethune & Co. v. Maury & Co.]

it paid when presented; that he thought there would be a lawsuit between him and plaintiffs, and he had given the check for the purpose of forcing plaintiffs to sue him, instead of having to sue them. The check was not paid, when presented the next day; but said Peck testified, that it would have been paid, if Munter had not given him said notice not to pay it. On the same day, October 31st, plaintiffs notified defendants and the other warehousemen that said receipts and orders had been obtained from them by fraud, and not to deliver the cotton to any one without the further order of plaintiffs; and before this suit was brought, they demanded said seven bales of the defendants, who refused to deliver it to them.

"On the 7th December, 1878, Farley, Spear & Co. held a bill of exchange for $1,000, drawn by J. Abraham & Brother on said M. Munter & Brother, and by them accepted; which fell due on that day, and was the proper debt of Munter & Brother; and in order to raise money to pay said bill, said M. Munter deposited with Farley, Spear & Co. the said warehouse receipts which he had obtained from plaintiffs, including the receipts for the seven bales stored in defendants' warehouse. Some of said receipts were indorsed by said Munter & Brother, by writing their name across the back, at the time they were so deposited with said Farley, Spear & Co., and some afterwards. Upon these receipts, thus deposited as collateral, Farley, Spear & Co. let said Munter & Brother have $1,000 with which to pay said bill of exchange, and the same was cancelled. At the time of this transaction, Farley, Spear & Co. had no notice that plaintiffs had any claim to said cotton, and had no information as to the title to said cotton, except that shown by said receipts, which were in the name of Munter & Brother, and their possession by Munter & Brother. Munter & Brother having failed to pay the $1,000 obtained from Farley, Spear & Co., as aforesaid, said Farley, Spear & Co., about the 20th December, 1878, applied to the different warehouses, including defendants', for the cotton, and then, for the first time, learned of plaintiffs' claim to it. A few days before this suit was brought, Farley, Spear & Co. indemnified the defendants against any claim by the plaintiffs; and upon this indemnity, and surrendering the warehouse receipts, defendants delivered said seven bales of cotton to said Farley, Spear & Co., who are defending this suit in the defendants' name. On the day before the commencement of the suit, plaintiffs demanded the cotton of defendants; and defendants replied to this demand, that they had delivered the cotton to the purchasers from Farley, Spear & Co. upon the tender and delivery of the

receipts as aforesaid. The value of the cotton was also proved.

"The foregoing was the substance of the whole of the testimony in the cause; and on this evidence, the court charged the jury, in writing, as follows: ' 1. If the jury believe, from the evidence, that Munter & Brother sold to Maury & Co. various lots of cotton, amounting in all to over five hundred bales; and that on such sales Maury & Co. paid Munter & Brother for the cotton, and it was delivered to them, but it was understood, as a part of the contract of sale, that Maury & Co. had a right to reject any of the cotton which, upon examination, proved to be water-packed, or otherwise fraudulently packed; then the legal effect of the sale was to vest in Maury & Co. the legal title to all the cotton so sold, paid for, and delivered, and this legal title was good against Munter & Brother; and any one claiming under them. And if the jury believe, from the evidence, that Munter, with the intent, and for the purpose of getting possession and control of the cotton, so as to force Maury & Co. to sue him, falsely pretended to agree with Maury & Co. as to the number of bales of cotton they had the right to reject, and falsely pretended that he assented to their right to reject thirty-one bales of the cotton, and falsely pretended to agree to a settlement of accounts between them on that basis, and thereupon gave Maury & Co. a check for the balance found on such accounting, not intending that the check should be paid; and that by such false pretenses Munter obtained from Maury & Co. the warehouse receipts for the thirty-one bales of cotton; then the legal title to said thirty-one bales was not affected by such delivery of the warehouse receipts, and Maury & Co.'s right to the cotton remained the same as before the pretended settlement.'

"The court charged the jury, also, on the request in writing of the plaintiffs, as follows: ' 2. If the jury believe, from the evidence, that the cotton was sold by Munter & Brother to Maury & Co.; and was delivered to them, and paid for by them, and was turned out of the warehouse for shipment on the order of Maury & Co.; and that a part of the cotton which Maury & Co. claimed the right to reject was returned to the warehouse by their direction, and a new receipt issued for it; then this constituted the warehousemen the bailees of Maury & Co., of the cotton so re-stored in the warehouse; and the fact that the name of Munter & Brother was entered in the receipt did not, of itself, change the relation between Maury & Co. and the warehousemen; and it was the duty of the warehousemen to hold the cotton for account of Maury & Co., unless Maury & Co. lawfully parted with their right to the possession and control of the cotton.' "

The defendants excepted to each of these charges, and they now assign them as error.

WATTS & SONS, for appellants. —1. Until Maury & Co. had examined the cotton, and had determined whether or not they would accept it, and had paid the $5.00 per bale, there was no sale. The general principle applies, that where any thing remains to be done before the contract is complete, such as determining the quality, quantity, or price, until these things are done the contract is merely executory, and the title does not vest in the purchaser.—*Falls v. Gaither*, 9 Porter, 605; *Magee v. Billingsley*, 3 Ala. 679; *Batre v. Simpson*, 4 Ala. Rep. 305; *Screws v. Roach*, 22 Ala. 675; *Hudson & Stokes v. Weir & Tate*, 29 Ala. 294; *Moore, Waldman & Co. v. Parks*, 61 Ala. 409; Story on Sales, § 246; Benjamin on Sales, 236; *Hare v. Huntly*, 21 Vermont, 147; *Stone v. Peacock*, 35 Maine, 385; *Ward v. Shaw*, 7 Wendell, 404; *Parks v. Mitchell*, 5 N. H. 165; *Welsh v. Bell*, 32 Penn. St. 12; *Martin v. Hurlburt*, 9 Minn, 142; *Strauss v. Ross*, 25 Indiana, 300.

2. When goods are sold and delivered, the purchaser promising to restore them on the happening of a certain contingency, or to pay a sum of money for them, the title vests in the purchaser, subject to an option in him to return them; and on the exercise of this right by returning them, the contract falls to the ground, and is defeated, as if it had never existed.—Wait's Actions and Defenses, vol. 5, 816; *Wilson v. Stratton*, 47 Maine, 120; *Hall v. Merriweather*, 19 Texas, 224; *Hunt v. Wyman*, 100 Mass. 200; *Aiken v. Hyde*, 99 Mass. 183; *Sewall v. Henry*, 9 Ala. 24. Under these authorities, if the title to the cotton passed to Maury & Co. by the delivery under the original contract, the title to the thirty-one rejected bales vested at once in Munter & Brother when they were rejected; and such was the understanding and intention of Maury & Co. when they took the new receipts in the name of Munter & Brother. If these bales had then been burned up, the loss would have fallen on Munter & Brother, and not on Maury & Co.

3. Again, the title to these bales certainly re-vested in Munter & Brother, if not before, at the time of the settlement, and by the delivery of the receipts to them. The delivery of the receipts was a symbolical delivery of the cotton itself; and the non-payment of the check did not operate a divestiture of the title. If Maury & Co. had any lien on the rejected bales, it would only continue while they held possession of the receipts.—Wait's Actions and Defenses, vol. 5, 578. They might have sued Munter & Brother for the receipts, if obtained from them wrongfully, or might have protected

themselves by a public notice of their rights. But they took no such steps, and suffered the receipts to pass to a *bona fide* holder without notice. A delivery of the warehouse receipt is a delivery of the cotton itself.—*Gardner v. Howland,* 2 Pick. 599 ; 53 N. Y. 426 ; *Newcomb v. Cabell,* 10 Bush, Ky. 460 ; *Burton v. Duryea,* 40 Illinois, 325 ; *Gibson v. Stevens,* 8 How. 400 ; *Horr v. Barker,* 8 Cal. 614. If an indorsement or assignment of the receipts be held necessary to pass the legal title (as in the case of *Marshall v. Lehman, Durr & Co.,* 47 Ala. 362), then the legal title passed to Farley, Spear & Co., under the assignment by Munter & Brother ; and plaintiffs, not having the legal title, can not maintain trover.—2 Stew. 38 ; 7 Porter, 279 ; 11 Ala. 859 ; 17 Ala. 9.

4. If Munter obtained the receipts by practicing a fraud, Maury & Co. can not reclaim them as against an innocent sub-purchaser.—Addison on Torts, 420 ; *Salters v. Everett,* 20 Wendell, 267 ; *Root v. French,* 13 Wendell, 570 ; *Herbert v. Huie,* 1 Ala. 18 ; *Rowley v. Bigelow,* 12 Pick. 307 ; *Hoffman v. Noble,* 6 Metc. 68 ; *Sinclair v. Healy,* 4 Wright, 417 ; 12 Johns. 348.

TROY & TOMPKINS, *contra.*—On the undisputed facts of the case, the legal title to all the cotton passed to Maury & Co. by the original transaction. The reservation to them of the right to reject any bales falsely packed was, in legal effect and operation, nothing more than a warranty as to the merchantable quality of the cotton ; and the reservation of a small part of the price was a mere security for the perform- ance of an act by the vendor, which it was his duty to per- form without it.—Benjamin on Sales, § 334, note *t;* *Bacon v. Gilman,* 4 Lans. 456. The title to the rejected bales, having once passed to Maury & Co., never again vested in Munter & Brother. These bales were stored in the warehouse to the account of Maury & Co., who also had the receipts ; and the possession of the receipts was obtained from them by fraud. Where the possession of personal property is obtained by fraud, no title passes, and the vendor may rescind the sale ; and if he does so, the right of possession, if it ever passed out of him, re-vests in him.—Benjamin on Sales, § 439, note *e;* Central Law Journal, vol. 8, p. 429. Even if there had been no fraud, the title to the cotton did not pass by the delivery of the receipts.—*Lehman, Durr & Co. v. Marshall,* 47 Ala. 362. The defendants received the cotton from Maury & Co., and stored it on their account; and having parted with it with- out their order, and against their positive instructions, they are liable as for its conversion.—2 Greenl Ev. § 642 ; *Brom- ley v. Coxwell,* 2 B. & P. 438 ; 4 T. R. 260. Farley, Spear &

Co. can not claim to be *bona fide* purchasers without notice ; since they knew that the cotton was stored with the defendants, and could have ascertained, by inquiry of them, who asserted rights or claims to it. Being chargeable with the want of ordinary prudence, in failing to make such inquiries, they are not innocent purchasers.—*Pringle v. Pringle*, 5 Sand. 117.

SOMERVILLE, J.—A sale may properly be defined to be, "a transfer of the *absolute*, or *general* property in a thing, for a price in money."—Benj. on Sales, § 1. If any thing remains to be done by either party to the transaction, before delivery,—as, for example, to determine the price, quantity, or identity of the thing sold,—the title does not vest in the purchaser, but the contract is merely executory.—*Hudson v. Weir*, 29 Ala. 294.

Where, however, goods are sold and delivered, the terms of sale being specified, and the vendee reserves the right to reject or return, the title passes, liable to be divested by the exercise of this option to rescind, expressed within a reasonable time. When there is a warranty by the seller, express or implied, this right would exist, without any special stipulation to that effect in the contract of sale. If the seller fails to deliver that which he has agreed to sell, the purchaser may rescind the contract, and return the goods, or retain them, and claim a deduction for their relative inferiority in value.—*Magee v. Billingsley*, 3 Ala. p. 679 ; 1 Smith's Lead. Cas. (17th Am. Ed.) 326.

Here, the appellees expressly reserved the right to inspect and re-weigh the cotton purchased from Munter & Brother, and to reject such bales as might be found to be "sand-packed, seed-packed, or water-packed." The cotton was delivered, and the warehouse receipts surrendered. The stipulated price was paid, excepting about five dollars per bale, which was retained merely as a security for the faithful performance of the contract on the part of the vendors. Under this state of facts, the title to the five hundred or more bales of cotton purchased from Munter & Brother by the appellees, clearly vested in them.

The evidence shows that the seven bales of cotton, for which this action was brought, was a portion of this five hundred or more bales. To maintain *trover* for them, the appellees, who were plaintiffs in the suit below, must have had a property in the cotton, and the right of possession at the time of the conversion. If they have legally parted with either of these pre-requisites, they are debarred from bringing this suit.

(2)

It is a noticeable fact, that the warehouse receipts for the rejected cotton were taken by appellees *in the name of Munter & Brother*, when they returned it to the warehouse of the appellants. When the settlement took place between them, and the bank check was drawn and delivered, the cotton receipts were also delivered up to Munter & Brother, by whom they were subsequently indorsed to Farley, Spear & Co., for value, and without notice.

A receipt of this character is not, in any technical sense, negotiable. It merely stands in the place of the property represented by it, and the delivery of the receipt, apart from any statute regulating the transfer, would have the same effect in transferring the title to the property, as the delivery of the property itself. In other words, the delivery of such *indicia* of title is usually regarded as a symbolic delivery of the property itself.—*National Bank v. Walbridge*, 19 Ohio State Rep. 419 ; *Burton v. Duryea*, 40 Ill. 325 ; *Horr v. Barker*, 8 Cal. 614.

If the receipts had been taken in the name of the appellees (Maury & Co.), then an indorsement would have been necessary to convey the *legal* title, under the provisions of section 2099 of the Code.—*Lehman, Durr & Co. v. Marshall*, 47 Ala. 362. In this transaction, appellees assumed, it seems, to act as the agents of Munter & Brother ; and in the subsequent settlement between the parties, and acceptance of the surrendered receipts, this agency in depositing the cotton in the warehouse of appellants was fully ratified. These receipts, being in the name of Munter & Brother, needed no indorsement to them in writing. Their delivery unindorsed, under the circumstances, was a symbolical delivery of the cotton.

It is maintained that Munter & Brother obtained possession of these receipts by fraud, and that, to this end, they made the settlement with Maury & Co., and gave the bank check to them with preconceived intent to intercept its payment.

It was not until recently that the question was settled, whether property in goods passes to the purchaser by a sale which the vendor was fraudulently induced to make. The rule, as deduced by a learned text-writer, seems to be as follows :—"Whenever goods are obtained from their owner by fraud, we must distinguish whether the facts show a *sale* to the party guilty of the fraud, or a mere delivery of the goods into his *possession*, induced by fraudulent devices on his part." Benj. on Sales, § 433. "In other words, we must ask whether the owner intended to transfer both the property in, and the possession of the goods, to the person guilty of the fraud, or to deliver nothing more than the bare possession. In the

[Allen, Bethune & Co. v. Maury & Co.]

former case, there is a contract of sale, however fraudulent the device, and the property passes; but not in the latter. This contract is *voidable* at the election of the vendor, not *void ab initio.*"—*Ib.* § 433. Where such is the case, it follows that the vendor may affirm and enforce the contract, so far as the vendee is concerned, or he may, at his option, rescind it.

But there is a limitation of this principle, in favor of *bona fide* purchasers, without notice, from the fraudulent vendee. A third person, in such cases, may acquire a good title from such vendee by giving him value for the property, or incurring some responsibility upon the credit of it, without notice of the fraud. No one can 'claim' protection except a purchaser, as distinguished from a mere donee without consideration; and he must have been ignorant of the fraud practiced on the deceived vendor.—1 Addison on Torts (Dudley and Baylie's Ed. 1876), 420; Benj. on Sales, § 433, *note (i); Thames & Co. v. Rembert's Adm'r,* 63 Ala. 561.

There is no evidence in this case showing, nor is it insisted in argument, that Farley, Spear & Co., who defended this suit, for appellants, and in their name, in the lower court, had any notice of the alleged fraud practiced on appellees by Munter & Brother. The notice given the warehousemen was no notice to them.—*Magee v. Billingsley,* 3 Ala. 679.

The appellees, Maury & Co., *had procured the warehouse receipts to be taken in the name of Munter & Brother.* This fact enabled them to practice the imposition complained of, upon the parties to whom the receipts were transferred. There is ample scope here for an estoppel against them, upon the familiar and just principle, declared long ago by Lord Holt, in *Hern v. Nichols,* 1 Salkeld, 289: "Seeing somebody must be a loser by this deceit, it is more reason that he that employs and puts a trust and confidence in the deceiver should be a loser, than a stranger."

The charges given by the court below did not recognize this principle as affecting the rights of Farley, Spear & Co., and were erroneous.

Reversed and remanded,